548 F.Supp. 1091 (1982)
Michael BECKER, Plaintiff,
v.
EGYPT NEWS COMPANY, INC., Defendant.
No. 82-0443C(5).
United States District Court, E. D. Missouri, E. D.
September 30, 1982.
*1092 *1093 Thomas M. Carney, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for plaintiff.
Bernard Edelman, Clayton, Mo., for defendant.

MEMORANDUM OPINION
CAHILL, District Judge.
Michael Becker commenced this action under 15 U.S.C. §§ 2 and 26 seeking permanent injunctive relief from Egypt News' alleged monopolistic practices. The parties presented at the injunction hearing live testimony and documents as well as post-trial legal memoranda. Becker alleges that Egypt News utilized its monopolistic power in an effort to exclude him from selling at retail a horse racing publication at Fairmount Park, a St. Louis area race track located in Illinois. Becker seeks injunctive relief restraining Egypt News from refusing to sell him the racing publication at wholesale. Based on the record before the bench, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

A. The Daily Racing Form
The Daily Racing Form (DRF) is a nationally distributed race track publication that is compiled and published by the Daily Racing Form (the Company) of Chicago, Illinois. A policy of the Company is to restrict the wholesale distribution of the DRF in a geographic area to one wholesale distributor. Thus, for example, a retailer in the St. Louis metropolitan area would find it very difficult, if not impossible, to purchase the DRF in large quantity from a Chicago wholesale distributor. The DRF provides detailed information about past performances of thoroughbred racehorses at racetracks in the United States. The DRF includes information about the horses' performance during workouts, track conditions at the various race tracks and a wealth of other information to aid the prospective bettor in choosing a winning thoroughbred. Although other racing publications are sold at the racetracks, it is clear from the evidence adduced at the injunction hearing that the DRF is a unique publication on which other horseracing periodicals base their information. No other racing publication in the United States provides as much detailed information as extensively as the DRF.
*1094 The DRF is published in two editions  the "regular" edition, which according to the Company's policy is not usually sold at racetracks, and the "pre-date" edition which is normally retailed at the tracks as well as other locations.
The DRF is shipped from Chicago to Egypt News in St. Louis, Missouri. Egypt News then distributes the DRF to various retail dealers throughout the St. Louis metropolitan area including Becker who ultimately sells the publication at Fairmount Park at retail. Although the DRF is sold at other retail outlets known as "town accounts," approximately 45% of all the Daily Racing Forms retailed in the St. Louis area are sold at Fairmount Park.

B. The Parties
Michael Becker is a resident of the State of Missouri. Becker's family has had concession rights at Fairmount Park since 1960. Becker became the principal concessionaire in 1968 and has continued the arrangement to which Fairmount and Becker's father had agreed. Concession rights must be renewed annually and Becker pays a stated consideration for permission to peddle his wares at Fairmount.
Egypt News is a corporation organized under the laws of Illinois. Its principal place of business is in Johnston City, Illinois. In February, 1981, Egypt News acquired via a contractual arrangement the rights to distribute the DRF at wholesale in the St. Louis area. According to officials at Egypt News, that corporation will maintain the right to distribute the DRF in the St. Louis area as long as the Company is satisfied with Egypt News' performance. Apparently Egypt News has done a satisfactory job to date.

C. Refusal to Deal
Prior to February, 1981, a group known as the Molasky family was designated by the Company to distribute the DRF at wholesale in the St. Louis area. After a series of negotiations, Egypt News acquired the assets of the Molasky Company, Racing Services Corporation, and also the distribution rights of the DRF in the St. Louis area. There is no evidence that the Molasky family or the officials at Fairmount were dissatisfied with Becker's performance at the racetrack while the Molaskys were the wholesale distributor. However, at one point the Molasky family attempted to replace Becker as the concessionaire at Fairmount. Moreover, officials at Fairmount stated that the racetrack's only concern was to have enough copies of the DRF for its patrons. The racetrack officials admittedly did not closely scrutinize Becker's business practices in the same perspective as did Egypt News.
According to a letter sent to Becker by Robert Austin, owner of Egypt News, it is clear that at the time of the acquisition of assets from the Molasky family Egypt News was dissatisfied with Becker's performance and decided to deliver all copies of the DRF to the town accounts as well as maintain the retail sales business at Fairmount Park. Witnesses at the injunction hearing testified that one reason Egypt News desired to retail the DRF at Fairmount was Becker's careless handling of the DRF retail operation. Egypt News officials related that often the DRF retail booths were left unattended while Becker peddled his own racetrack publication, the "Tip Sheet." The officials posit that Becker's inattentiveness toward the DRF resulted in a greater number of returned copies which decreased Egypt News' profit margin. The officials stated that due to Becker's business conduct, retail sales of the DRF declined in 1981 from the level achieved in 1980. Becker does not dispute the declination of retail sales at Fairmount but attributes it to a shorter racing season in 1981. But, according to Ken Wellborn, who oversees distribution of the DRF for Egypt News, 1981 attendance figures at Fairmount exceeded the 1980 level notwithstanding the shortened racing season.
Wellborn indicated that Becker's performance at Fairmount caused Egypt News to lose money and jeopardized its wholesale distributorship. The unrefuted testimony shows the retailer bears no risk of loss on *1095 unsold returned publications. The Company generally expects a return date of approximately ten to fifteen percent (10-15%). If a return rate is too high, the wholesaler ultimately bears the risk of losing its distributorship. As mentioned above, Egypt News was concerned about Becker's return rate and sought to protect its interest by controlling the retail operation at Fairmount.
Wellborn also stated that Becker often did not fulfill his obligation of supplying the town accounts with a sufficient number of copies of the DRF. On those occasions, proprietors of the town accounts contacted Wellborn seeking additional copies of the DRF.
Finally, Wellborn testified that Becker continuously sold the regular edition of the DRF at Fairmount in violation of the Company's policy.
Despite Becker's shortcomings charged by Egypt News, Austin offered him a job with Racing Services Corporation due to Becker's experience and knowledge of the DRF business. But Austin also indicated that better business judgment mandated Becker's replacement as the DRF retailer at Fairmount.
Ron Ryan, Vice-President of Operations, Egypt News, contacted Fairmount early in 1982 about the prospect of Egypt News becoming the retail distributor at the track. Jack Weaver, General Manager, Fairmount Park, testified that Ryan and Bernard Edelman, attorney for Egypt News, indicated that Becker had to be replaced as the retailer at Fairmount. Before contacting the Fairmount officials, Egypt News had notified Becker of its intent to replace him at the racetrack. Ryan stated that Egypt News could offer Fairmount a better financial package regarding the concession rights.
Fairmount selected Becker rather than Egypt News as the concessionaire at the track due to Becker's background and experience in the industry and because Becker presented a better financial arrangement. Egypt News then notified Becker that all shipments of the DRF would cease. Becker futilely attempted to obtain a quantity of the DRF from other sources, including the Company in Chicago.
Becker then commenced this action on March 26, 1982, the same day the 1982 racing season began at Fairmount. The Court issued a temporary restraining order against Egypt News that enjoined that corporation's refusal to sell the DRF to Becker at wholesale. By consent of the parties, the restraining order remains effective until this matter is resolved. At the parties' request, the Court is entertaining the instant action as one for permanent injunctive relief.

CONCLUSIONS OF LAW

A. Jurisdiction
The Court has subject matter jurisdiction of this matter pursuant to 15 U.S.C. § 2[1] and 28 U.S.C. § 1337(a).[2] Inasmuch as the DRF is printed in Chicago, Illinois, shipped to St. Louis, Missouri, and then *1096 distributed and sold to consumers in Cahokia, Illinois, Egypt News' alleged monopolistic practices directly interfere with the interstate flow of the DRF, and thus, substantially affect interstate commerce. McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

B. Monopolization
Becker maintains that Egypt News is exercising its monopoly power to exclude him from retailing the DRF at Fairmount in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. (See note 2, supra.)
There are two elements that must exist to find a § 2 monopolization violation: (1) the possession of monopoly power in the relevant market, and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).
Monopoly power has been defined as "the power to control prices or exclude competition." United States v. E. I. duPont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Egypt News asserts in the first instance that it is not in competition with Becker on a retail sales level and therefore its actions do not come within the proscription of the Sherman Act. Egypt News became a retail competitor at Fairmount once it sought to replace Becker as the track concessionaire. Therefore, we must determine if the facts otherwise support a determination that Egypt News has violated § 2.

1. Relevant Market
In order to determine if a person, firm or corporation has monopoly power, the relevant product and geographic markets must first be defined. J. Von Kalinowski, Antitrust Laws and Trade Regulation, § 8.02[1]; See generally, United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778.
In determining the relevant product market, the Court must examine the reasonable interchangeability of use and the cross-elasticity of demand for the product in issue. Such factors as price, quality, and consumer readiness and ability to accept reasonable alternatives must be considered. United States v. duPont & Co., supra, 351 U.S. at 394, 396-404, 76 S.Ct. 994 at 1006, 1008-12; United States v. Grinnell Corp., supra, 384 U.S. at 571, 86 S.Ct. at 1704; Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910, 918-19 (8th Cir. 1976).
The record in the case at bar is replete with evidence that the DRF is a highly unique publication. No other racetrack publication nationwide is even remotely comparable in terms of quantity of information and quality of content. Thus, the Court finds that the relevant product market is the DRF.
The relevant geographic market is the area of effective competition within which the defendant operates. United States v. duPont & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264; Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., supra, at 918. In order to determine the relevant geographic market, the Court must examine the area or areas in which the particular firm or corporation actually conducts its business. J. Von Kalinowski, supra, § 8.02[2]. A monopoly may exist for purposes of § 2 even though limited to a narrow territory or a localized geographical area. International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).
Inasmuch as Egypt News' wholesale distribution of the DRF is confined to the St. Louis area market by the Company, the Court finds little difficulty in determining that the relevant geographic market is the St. Louis metropolitan area.

2. Power Within the Relevant Market
Once the relevant market has been defined, the Court must determine whether Egypt News' share of that market constitutes *1097 the requisite degree of monopoly power to establish actual monopolization. United States v. Grinnell Corporation, 384 U.S. at 571, 86 S.Ct. at 1704. The Supreme Court has held that a two-thirds share of the domestic field of cigarettes constituted a substantial monopoly. American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946).
The evidence shows that Egypt News holds a virtual 100 percent share of the DRF wholesale market in the St. Louis metropolitan area. As Becker and others testified, attempts to obtain the DRF at wholesale from other sources, including the publisher in Chicago, have been wholly futile. There is no other wholesale distributor in the St. Louis area from which Becker or other retailers can purchase the DRF. Therefore, the Court reaches the inescapable conclusion that Egypt News has the requisite monopoly power to sustain a claim of monopolization.

3. Exclusion of Competition
The bench initially recognizes the basic rule followed by federal courts that in the absence of any purpose to create or maintain a monopoly, the Sherman Act does not restrict the right of a trader engaged in an entirely private business from freely exercising his own independent discretion as to the parties with whom he will deal. United States v. Colgate, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Moore v. Jas. H. Matthews & Co., 550 F.2d 1207 (9th Cir. 1977); Shawver & Son, Inc. v. Oklahoma Gas & Electric Co., 463 F.2d 204 (10th Cir. 1972). However, in a case such as the instant one where the Court has determined that the defendant is a monopolist, added obligations are imposed on the defendant which would not attach in the ordinary refusal to deal context.
There are conceptually similar lines of cases that impose a duty to deal upon a monopolist. The case at bar is exemplary of an alleged attempt of a wholesaler monopolist to vertically integrate by gaining control of the retail market in the applicable geographic area. In many cases, a refusal to deal designed to accomplish vertical integration, without more, should not be a basis for imposing liability. Sargent-Welch Scientific Co. v. Ventron Corp., 567 F.2d 701, 712 (7th Cir. 1977), cert. denied, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). A federal court must necessarily carefully review the facts of a particular case and discern the intention of the monopolist that motivated its conduct.
Although a general intent to monopolize is all that is ordinarily required to find a § 2 violation, see United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 S.Ct. 1236 (1948); United States v. Aluminum Co. of America, 148 F.2d 416, 431-432 (2d Cir. 1945), other cases that have analyzed the monopolist's duty to deal have essentially required a specific intent to monopolize. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). The courts have not been conclusive on the applicable standard of intent. Some cases have adopted standardless language such as, "bold, relentless and predatory" when examining the monopolist's conduct. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).
Notwithstanding the inconclusiveness of the judicial decisions, the import of the case law is that what should matter is not the monopolist's state of mind but the overall impact of the monopolist's practices. As preservation of competition is at the heart of the Sherman Act, a practice should be deemed unfair or predatory only if it is unreasonably anti-competitive. Byars v. Bluff City News Co., Inc., 609 F.2d 843, 860 (6th Cir. 1980). Thus, a finding of antitrust liability should not be made without closely examining the proffered business reasons which might justify the refusal to deal. International Railways of Central America v. United Brands Company, 532 F.2d 231, 239-40 (2d Cir. 1976), cert. denied, 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976); Clark v. United Bank of Denver National Association, 480 F.2d 235, 238 (10th Cir. 1973), cert. denied, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973).
*1098 Although the case law outlines no parameters of allowable business justifications for a refusal to deal, the Court is convinced that there was ample justification in the instant action for Egypt News to end its business relationship with Becker. Thus, Egypt News' actions were not unreasonably anticompetitive but a valid exercise of business judgment to protect its investment.
The Court does not reach its conclusion without reservation. Arguably, this is a close case. Little evidence was presented that was not contradicted. However, there was enough evidence offered upon which reasonable minds could conclude that by seeking control of the retail sales at Fairmount, Egypt News not only sought to increase its profits, a goal that is the basic fabric of business America, but also sought to protect its substantial investment. The Court does not wish to unnecessarily inhibit by judicial fiat the right of any business to freely exercise its discretion in an effort to protect its valid business interest. Therefore, Becker's request for preliminary and permanent injunctive relief is denied.
NOTES
[1] 15 U.S.C. § 2 provides:

§ 2. Monopolizing trade a misdemeanor; penalty
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. July 2, 1980, c. 647, § 2, 26 Stat. 209; July 7, 1955, c. 281, 69 Stat. 282.
[2] 28 U.S.C. § 1337(a) provides:

§ 1337. Commerce and antitrust regulations; amount in controversy, costs
(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies; Provided, however, That the district courts shall have original jurisdiction of an action brought under section 20(11) of part I of the Interstate Commerce Act (49 U.S.C. 20(11)) or section 219 of part II of such Act (49 U.S.C. 319), only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.