Michael BECKER, Appellant,

v.

EGYPT NEWS COMPANY,
INC., Appellee.

No. 82-2222.

United States Court of Appeals,
Eighth Circuit.

Submitted March 17, 1983.

Decided July 29, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 1, 1983.

Mark G. Arnold, Thomas M. Carney, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for appellant.

Bernard Edelman, Clayton, Mo., for appellee.

Before HEANEY, ROSS and FAGG, Circuit Judges.

FAGG, Circuit Judge.

Michael Becker appeals from the district court's ruling that Egypt News' termination of its business relationship with him did not violate Section 2 of the Sherman Act. Becker argues that the court errone-

ously analyzed Egypt's business justifications and motive for its refusal to deal and that the court failed to consider the effect of Egypt's action on competition in the secondary market. We affirm the district court.

## I. BACKGROUND

The Daily Racing Form company publishes a nationally distributed racetrack publication called The Daily Racing Form. The DRF is apparently a unique publication because no other racing publication provides such extensive and detailed horseracing information. In fact, we are told that other horseracing publications derive their information from the DRF. The company has a policy of restricting the wholesale distribution of the DRF in a geographic area to one wholesale distributor. In February 1981, Egypt became the wholesale distributor in the St. Louis metropolitan area when it acquired the assets of the previous distributor, the Molasky family. No contract exists between Egypt and the company; the company has merely granted Egypt distribution rights which can be withdrawn by the company any time Egypt has not performed within its expectations. Becker's family has retailed the DRF and other publications at the Fairmont Park racetrack since 1960. In 1968, Becker replaced his father as the retailer and he pays Fairmont for its permission to sell the DRF and his own tip sheet at its racetrack. Becker's retail outlet at Fairmont Park sells approximately 45% of all the DRF's retailed in the St. Louis area; however, there is no contract between Egypt and Becker.

In a letter dated January 18, 1982, Robert Austin, the owner of Egypt, informed Becker that, due to his dismal retailing performance in 1981, he would no longer be one of Egypt's retailers. The letter stated that Egypt intended to retail the DRF at Fairmont when it purchased the Molasky family assets but the timing of the purchase caused Egypt to "let everything stand" through 1981. The letter went on to detail Egypt's unhappiness with Becker's 1981 retail operation at Fairmont:

Our review of the prior year at the race track found poor promotion of the Daily Racing Form and poor condition of stands in the way of decals, signs, pamphlets, etc. Also, there were several occasions when the stands were left unoccupied during the course of the racing evening. Additionally, lack of copy movement at the race track resulted in sell-outs at some stands and copies being available at others.

Egypt was also dissatisfied with Becker because he would neglect the retailing of the DRF while he peddled his own racetrack publication. Moreover, despite the fact that attendance at Fairmont increased between the 1980 and 1981 racing season, Becker's sales of the DRF were actually less in 1981 than in 1980. Additionally, Becker's unsatisfactory performance had a detrimental impact on Egypt since Egypt, as wholesaler, bore the risk of losing its distributorship if the company became unhappy with its operation.

Despite the letter informing him that Egypt would not sell him the DRF at wholesale, Becker did not contact Egypt but instead contacted the track officials and discussed his desire to continue retailing the DRF at the track. In February and March 1982, after the letter of termination had been sent to Becker, Egypt officials contacted Jack Weaver, Fairmont's general manager, and, unaware of Becker's post-termination discussions, indicated that Becker had to be replaced as the DRF retailer at Fairmont because of his unsatisfactory performance. Ron Ryan, vice president of Egypt's operations, met with Weaver and told him that Egypt could do a better job because it would promote the DRF better than it had been promoted in the past. He promised that salesmen would be there every night two hours before post time and through the rest of the evening until the last race was finished. Ryan also volunteered to sell the track the copies it needed for its racing secretary's office and switchboard at cost. Ryan testified that he had no idea that Becker was in the process of negotiating with the racetrack and Weaver admitted he did not tell anyone at

Egypt to submit a proposal that Weaver would be comparing to Becker's proposal.

Weaver testified that Becker and not Egypt received permission to retail the DRF at Fairmont for the 1982 season because Becker had experience and because he made a better financial arrangement. Egypt does not challenge either Fairmont's right to select Becker as its DRF retailer or Fairmont's prerogative to utilize competitive bidding procedures; instead, Egypt stands upon its own prerogative under the facts found by the district court justifiably to refuse to supply Becker with the DRF and maintains that it has no Section 2 liability for its refusal to deal with an unsatisfactory retailer. Hence, consistent with its January letter, Egypt refused to supply Becker with the DRF and his attempts to obtain a quantity of the DRF from other sources to fulfill his obligation to Fairmont were futile. On the day the racing season began at Fairmont, March 26, 1982, Becker commenced this suit seeking an injunction against Egypt's refusal to sell at wholesale. The district court issued a temporary restraining order and conducted a two-day trial in early April to determine whether a permanent injunction should issue. In September 1982, the district court denied Becker permanent injunctive relief finding Egypt's refusal to deal justified by valid business considerations. In January 1983, the district court granted Becker's motion for an injunction pending appeal prohibiting Egypt from refusing to deal.

## II. MONOPOLIZATION

Becker urges that Egypt is exercising its monopoly power in violation of Section 2 of the Sherman Act by preventing him from retailing the DRF at Fairmont. The Supreme Court has enunciated two distinct elements of illegal monopolization: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–

71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The district court's conclusion that the first element existed because Egypt holds a virtual one hundred percent share of the DRF wholesale market in the St. Louis metropolitan area is not challenged on appeal. The remaining issue is whether Egypt's refusal to sell at wholesale to Becker and attempt to retail the DRF at Fairmont itself constitutes an unlawful abuse of its existing monopoly power in the wholesale market.

Generally, a company can refuse unilaterally to deal without antitrust consequences; however, a monopolist has added obligations in a refusal to deal situation. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274–75 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Byars v. Bluff City News Co.,* 609 F.2d 843, 854–55 (6th Cir. 1979). Egypt seeks to integrate forward into the retail distribution of the DRF at Fairmont Park. Since vertical integration by monopolists can have procompetitive effects, a refusal to deal to accomplish this integration, "as such without more, cannot be held violative of the Sherman Act." *United States v. Columbia Steel Co.,* 334 U.S. 495, 525, 68 S.Ct. 1107, 1123, 92 L.Ed. 1533 (1948); *see Byars v. Bluff City News Co., supra,* 609 F.2d at 861. To prove that Egypt's vertical integration was a Section 2 violation, Becker needed to establish that the integration would result in unreasonable anti-competitive effects. *See Byars v. Bluff City News Co., supra,* 609 F.2d at 860; *Mid-Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 615 F.2d 1372, 1388–89 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). Contrary to Becker's allegations, the district court determined upon substantial evidence that "Egypt News' actions were not unreasonably anti-competitive but a valid exercise of business judgment to protect its investment." *Becker v. Egypt News Co.,* 548 F.Supp. 1091, 1098 (E.D.Mo. 1982).

Becker argues that the district court failed properly to scrutinize Egypt's busi-

37

ness reasons which are in fact only post hoc justifications. Becker claims that the following evidence, among other examples, establishes the pretextual nature of Egypt's business reasons: (1) Egypt did not complain directly to Becker; (2) Egypt was upset with Becker's failure to hawk the product, which was against track rules; and (3) the Fairmont officials were not dissatisfied with Becker's performance. The record does not support Becker's contentions; on the contrary, it gives affirmative support to the reasons given by Egypt for Becker's termination.

The district court applied the proper standard and recognized the need to "closely examine" the proffered business reasons. 548 F.Supp. at 1097. The court also noted that "[l]ittle evidence was presented that was not contradicted." Id. at 1098. Regarding the lack of complaints directly from Egypt to Becker, the record reveals that when Ryan discussed Becker's shortcomings with track manager Roger Smith, Smith indicated he would deal with Becker to get the problems resolved. Becker himself testified that Smith contacted him and told him that Egypt had some complaints regarding his performance, specifically the lack of DRF identifying decals or signs on the stands. Becker then testified that shortly after Smith talked to him the signs were on the stands but he later admitted that he did not put them on the stands. Ryan stated that he put the signs up himself when they were still not up two weeks after he had complained. Egypt obviously did not contact Becker because Smith assured them that he would handle the problem. This testimony does not support Becker's allegations of post hoc justification.

The testimony concerning hawking the product also does not indicate that Egypt's business reasons for terminating Becker as its retailer were pretextual. Ryan stated that in his experience the DRF is normally hawked, "not necessarily walking through a crowd but rather from the stand" because the verbal expression that DRF's are for sale draws attention and increases sales. Ryan was unhappy with the fact that Becker was not verbally hawking the DRF but

that Becker's own tip sheet publications were being verbally hawked. Although Weaver testified that the track will not allow hawking "in and out of the audience," the record does not indicate that Egypt was unhappy with Becker for failing to break a track rule. Rather, Egypt wanted Becker to market the DRF using the same methods he used in marketing his own tip sheet at the track, verbal hawking.

Finally, the trial court discussed the differences between the track officials' and Egypt's evaluation of Becker's performance. It concluded that the "racetrack officials admittedly did not closely scrutinize Becker's business practices in the same perspective as did Egypt News." 548 F.Supp. at 1094. This finding is not clearly erroneous and explains why the differing evaluations do not lead to the conclusion that Egypt's evaluation of Becker's retailing operation as unsatisfactory was pretextual. Egypt bore the risk of losing its distributorship and would lose sales if Becker performed poorly and therefore was logically more concerned with Becker's performance than the racetrack which did not have a comparable interest in Becker's retailing abilities.

■ We have carefully examined Becker's other examples of post hoc justification and Becker has not convinced us that the district court erred in crediting Egypt's business reasons and in concluding: "[T]he Court is convinced that there was ample justification in the instant action for Egypt News to end its business relationship with Becker." Id. at 1098. Becker's poor retailing performance, including the fact that his DRF sales in 1981 declined from his sales in 1980, justified the January 1982 termination of his relationship as a retailer for Egypt. Egypt's action in refusing to supply Becker later in 1982 was the natural consequence of its earlier, justified termination of its relationship with Becker.

Becker also advances the argument that the court erroneously analyzed Egypt's motive in terminating him. Becker contends that Egypt's motive in refusing to supply

him with the DRF was to increase its profits which is not a legitimate reason for refusing to deal. Becker relies on language from *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334, 400 (5th Cir.1970), that "becoming a monopoly simply to make more money is not a 'legitimate business justification' for 'monopolizing.'"

■ In *Poster Exchange* the monopolist's refusal to deal was accompanied by grossly predatory practices, would have increased entry barriers, and could not be defended as an exercise of legitimate business judgment. Here there is no evidence of increased entry barriers and, as discussed above, Egypt had numerous reasons credited by the trial court for refusing to deal with Becker. A further distinguishing factor is the total absence of any predatory practices on the part of Egypt. We do not have a situation where Egypt refused to supply Becker in retaliation for losing a competitive bidding process. Rather, in January of 1982, Egypt justifiably terminated Becker due to his dismal 1981 retailing performance. Egypt did not issue an ultimatum to the racetrack forbidding it from doing business with Becker and took no steps to prevent him from retailing his tip sheet, or even the DRF if he could locate another supply source. Egypt simply informed the racetrack that due to its dissatisfaction with Becker's retailing, it would like to replace him. The racetrack was free to deny permission to Egypt to retail the DRF on its grounds and to prefer Becker or someone else as DRF retailer. However, Becker cannot nullify Egypt's termination for cause and fulfill his obligation to Fairmont by utilizing Fairmont's approval in an oblique attempt to force Egypt to be his DRF supplier. Egypt's decision to not supply the DRF to Becker was made in January of 1982 and, consistent with its earlier decision, it declined to supply Becker upon his demand in March of 1982. Egypt's conduct was not done for the purpose of driving a competitor out of the market and is, therefore, not predatory. *See* L. Sullivan, *Handbook of the Law of Antitrust,* § 43 at 108–13 (1977).

Unlike *Poster Exchange,* this is not a case where Egypt acted "*simply* to make more money" with no other motivating factors. Becker relies heavily on the testimony of Robert Austin, the owner of Egypt, who stated that increasing profits was a reason for Egypt's desire to operate the retail stands at Fairmont when Egypt purchased the assets of the Molasky family in February of 1981. However, during 1981 Egypt took no action to carry out Austin's statement. Throughout 1981 Egypt cooperated fully with Becker and Becker does not complain that any actions on the part of Egypt interfered with his 1981 retail operation. Nothing in Egypt's conduct during 1981 indicates that Becker was targeted for extinction if he performed satisfactorily. Becker cannot rely on Austin's statement to insulate his poor performance during 1981 which the trial court concluded, based on substantial evidence, justified Egypt's refusal to deal.

Additionally, Austin emphasized that having control over that major portion of Egypt's operation was necessary to protect its substantial investment. Courts have concluded that increased control and better service are legitimate business reasons justifying a change in the distribution method of a product. *See Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 278 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Hardin v. Houston Chronicle Publishing Co.,* 434 F.Supp. 54, 56 (S.D.Tex.1977); *Lamarca v. Miami Herald Publishing Co.,* 395 F.Supp. 324, 327 (S.D.Fla.1975). We cannot agree that Egypt refused to deal "simply to make more money" and without being motivated by the legitimate business reasons credited by the district court.

■ Becker next argues that the district court failed to consider the effect that Egypt's refusal to deal would have on competition. He urges that the overall impact of Egypt's practices is to destroy the competition for DRF concession rights in the secondary market with adverse consequences to Fairmont Park. Becker's theory is not borne out by the evidence since his

own witnesses testified to the absence of damage to Fairmont if Becker was replaced. Weaver stated: "If Michael Becker is cut off and the Daily Racing Form would be available for sale, the absence of Michael Becker would have no material effect on our racetrack." Likewise, Robert Graham, the executive vice president of Fairmont, testified that the track would not be damaged as long as it was supplied with a sufficient number of copies of the DRF. Additionally, Egypt did not issue any ultimatums to Fairmont after it decided in January not to deal with Becker. Fairmont was at liberty to allow retailing of any and all other publications and tip sheets and Egypt made no attempt to limit or control other concessions. Egypt's refusal to supply Becker with the DRF did not result in any unreasonable anti-competitive effects to Fairmont.

■ Likewise, Egypt's action has no unreasonable anti-competitive effects on Becker's retail operation. Based on Becker's inadequate performance, he has deservedly lost his right to receive a supply of the DRF from Egypt. Egypt did not take any action to prevent Becker from retailing his own tip sheet and other items at Fairmont; that remained a subject solely between Fairmont and Becker. Plus, Egypt did not act to prevent or obstruct Becker from obtaining the DRF from another source of supply.

■ Finally, Egypt's acts had no unreasonable anti-competitive effects on any general competitive market for the DRF concession rights because over the years there was not extensive competition. Weaver explained that in past years there was no competition for DRF concession rights. Becker was not notified on a yearly basis that he had permission to be a concessionaire. Instead, according to Weaver, Becker would come into the general office each year and discuss the upcoming season and in the absence of someone wanting to replace him it was generally understood that he could retail the coming year. Becker himself testified that he did not negotiate with the racetrack on a yearly basis but

that he believed he would be a distributor until he was told to the contrary. Becker's position was that upon Egypt's acquisition of the Molasky business, it was required to do business through him. Further, Weaver noted that no one else ever asked about retailing the DRF with the exception of one year in the late '70's when individuals had visited with him about taking over the DRF distribution rights at a different racetrack. Weaver, as general manager, had assisted Becker in staying on at that track by withholding permission to anyone else. Becker confirmed having discussions with the officials concerning permission to sell in 1977 and again in 1982 after Egypt had informed him it would no longer supply him with the DRF. The above discussion reveals that substantial evidence supports the conclusion that Egypt's acts did not have unreasonably anti-competitive effects on Fairmont, Becker or any general competitive market.

Becker acknowledges that courts have accepted a monopolist's vertical integration as lawful where the integrated monopolist can operate more efficiently. He argues that the racetrack's selection of his proposal as superior to Egypt's proves that he operates more efficiently than Egypt. Weaver testified that Becker received permission to sell the DRF because he had experience and because he made a better financial arrangement.

■ First, the financial arrangement offered by Becker is not in the record so it is impossible to compare the proposals of the two parties. For all we know, Becker made an ill-advised proposal from a business standpoint hoping that he could somehow indirectly thwart Egypt's previously announced termination of his relationship. Second, since Egypt was unaware that Becker was negotiating with Fairmont we do not have a situation where open, head to head competition existed because Egypt did not realize that its overtures were going to be compared to a proposal by Becker. Therefore, the track's selection was not based on grounds which would illustrate the relative efficiency of Becker and Egypt. In fact, the reasons which the trial court cred-

ited and determined justified the termination of Becker, *i.e.,* his poor retailing performance, indicate that Egypt would be more efficient since it would be improving the promotion of the DRF at Fairmont. Becker has failed to prove that his retailing operation is more efficient.

The courts have identified three anticompetitive situations where it would be potentially profitable for a monopolist to integrate forward even if it is less efficient than those replaced: (1) where integration allows price discrimination, (2) where integration erects barriers to first-level entry, and (3) where integration permits evasion of regulation of first-level monopoly profits. *See Paschall v. Kansas City Star Co.,* 695 F.2d 322, 328, 340 (8th Cir.1982) (Both the majority and the dissent utilized this proposition. We do not cite the case for any other propositions because it is under en banc consideration and no decision has, as of this writing, been filed.); *Byars v. Bluff City News Co., supra,* 609 F.2d at 861; Note, *Refusals to Deal by Vertically Integrated Monopolists,* 87 Harv.L.Rev. 1720, 1737–38 (1974). The record is barren of any evidence even suggesting that any one of those situations could result from Egypt's vertical integration.

■ Although Egypt's termination of Becker will have a detrimental effect on him, that injury by itself does not subject Egypt to antitrust liability. *See Anderson Engines, Inc. v. Briggs & Stratton Corp.,* 531 F.Supp. 1155, 1162 (M.D.Fla.1982); *Neugebauer v. A.S. Abell Co.,* 474 F.Supp. 1053, 1071 (D.Md.1979). The antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Egypt has demonstrated legitimate business reasons for its refusal to deal and Becker has failed in his burden of proving that Egypt's actions violate the law. Egypt's actions were an expansion to meet legitimate business needs. *See United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260 (1948).

Affirmed.