738 F.2d 261
 1984-2 Trade Cases 66,089
 TRACE X CHEMICAL, INC. and John F. Arens, Appellees,
v.
CANADIAN INDUSTRIES, LTD., C.I.L. Ammunition, Inc., I.C.I.
America, Inc., and Imperial Chemical Industries
Ltd., Appellants.
 No. 83-1847.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1983.
Decided June 29, 1984.
 
 Davis, Polk & Wardwell, New York City, Friday, Eldredge & Clark, Little Rock, Ark., for appellants.
 James B. Blair, Springdale, Ark., for appellees.
 Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Canadian Industries, Ltd., and CIL Ammunition, Inc., appeal from a judgment in favor of Trace X Chemical, Inc., and John F. Arens on their claim against the CIL group under Section 2 of the Sherman Act, 15 U.S.C. Sec. 2 (1982). Following the jury verdict of $500,000, the district court trebled the award pursuant to Section 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1982). CIL's motions for judgment notwithstanding the verdict and for a new trial were denied. Trace X manufactured and distributed cast TNT primers for use in the mining industry. CIL manufactured TNT and was the principal source of TNT for Trace X. Arens, Trace X's president, claimed that Trace X was forced out of business by CIL's anti-competitive conduct, particularly CIL's refusal of credit and its failure to replace allegedly defective TNT. CIL appeals from the judgment on the grounds that (1) there was insufficient evidence of any anti-competitive conduct on its part or that CIL caused the shutdown of Trace X's business, (2) the district court erred in admitting irrelevant, prejudicial documents, and (3) Trace X failed to adequately prove its damages. For the reasons stated below, we reverse.
 
 I.
 
 2
 When Trace X first began to buy TNT from CIL, it did so through Gulf Oil Company, Trace X's principal customer. This arrangement permitted Trace X to use Gulf's credit. Trace X had not provided the financial information required by CIL's credit section; therefore, any direct purchases by Trace X were to be paid by cash or certified check.
 
 
 3
 In April, 1976, CIL's credit section authorized Trace X to make direct purchases on thirty days credit, up to a limit of $16,000--the cost of one truckload of TNT. If Trace X ordered more than one load in a month, it would have to pay for each load before receiving the next. If the order went through Gulf, however, CIL would extend unlimited credit.
 
 
 4
 To meet the demand of its rapidly increasing sales, Trace X relied solely on CIL for its supply of TNT. Since the Trace X primer was composed of approximately 95 percent TNT, Trace X was vitally concerned with the availability, quality, and price of TNT. Because of Trace X's ever-increasing need for TNT, Arens became interested in manufacturing TNT. In February, 1976, he contacted CIL about its patented continuous-process method for making TNT, and CIL offered to license its process at a cost of $3,500,000. Instead, in late 1976, Arens purchased the equipment and blueprints of a military batch-process TNT plant in Childersburg, Alabama. Arens planned to reconstruct the plant in Arkansas and operate it there. Trace X prepared a prospectus for potential investors in its TNT manufacturing process. By March, 1977, Trace X had commitments for investment only from Arens and Szaloczi, vice president of Trace X. No contracts or commitments had been made by any customer other than Trace X itself.
 
 
 5
 From April through September, 1976, CIL's deliveries of TNT to Trace X increased steadily. CIL billed Gulf for almost all of Trace X's purchases during this period, but Gulf refused to pay, stating that Trace X was responsible for the purchases. After totalling the amount due on all these purchases and subtracting the amount owed by CIL to Trace X for primers, Trace X owed CIL $160,000, an amount far beyond Trace X's credit limit of $16,000.
 
 
 6
 To settle this account CIL met with Arens in October of 1976. Arens argued that according to Trace X's accounts, CIL owed Trace X rather than Trace X owing CIL because Trace X had received no invoices from CIL, while Trace X invoices to CIL for primers remained unpaid. CIL threatened to stop shipping TNT to Trace X if arrangements were not made to pay for the TNT that Trace X had received. After negotiating, Trace X agreed to pay CIL the $160,000 over a ten-week period. Arens also gave CIL his personal guarantee. CIL agreed to ship 40,000 pounds of TNT a week for ten weeks to Trace X and reaffirmed its commitment to supply all of Trace X's TNT requirements subject to availability. CIL insisted that future purchases be cash in advance. In February, 1977, CIL gave Trace X the further written assurance that it would supply 100,000 pounds of TNT per week thereafter.
 
 
 7
 In September of 1976 some of Trace X's customers complained that primers were misfiring. Trace X took back the faulty primers, gave its customers credit, and made and shipped them new primers. Arens told CIL that primers manufactured by Trace X had been failing and that tests conducted by Trace X showed that the TNT was at fault. CIL disputed this and refused to replace the TNT. CIL maintained that it was Trace X's manufacturing process, rather than defective TNT, that had caused the primer misfires.
 
 
 8
 In March, 1977, Trace X again asked for credit, presenting financial statements for the year ending September, 1976. CIL's credit section again declined to grant credit, stating that it would reconsider if provided with current, audited information for the six months from October, 1976, through March, 1977.
 
 
 9
 Arens shut down Trace X's primer business and decided to abandon its TNT project in March, 1977. According to Arens he was forced to shut down because CIL refused to extend credit to Trace X and would not replace the allegedly defective TNT. At the meeting in late March when Arens again asked CIL to replace the TNT, Ingham, CIL's marketing manager responded: "Why would we do that? If we exchange the TNT, you will just use your profits to compete against us in the manufacture of TNT."
 
 II.
 
 10
 By a general verdict the jury found that CIL violated Section 2 of the Sherman Act by monopolizing interstate commerce and by attempting to monopolize interstate commerce. Our scope of review of a jury verdict is limited. Roesch, Inc. v. Star Cooler Corp., 712 F.2d 1235, 1237 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984) (en banc). We must consider the evidence in the light most favorable to Trace X and give it the benefit of all legitimate inferences. Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); Roesch, Inc., 712 F.2d at 1237; J & J Farms, Inc. v. Cargill, Inc., 693 F.2d 830, 834-35 (8th Cir.1982). But the jury's factfinding power is not without limit. When the evidence leaves no room for a reasonable difference of opinion as to the proper resolution of the case, it should be decided by the court as a matter of law. Roesch, Inc. v. Star Cooler Corp., 671 F.2d 1168, 1171 (8th Cir.1982), aff'd by an equally divided court, 712 F.2d 1235 (8th Cir.1983); Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 883 (8th Cir.1978).
 
 III.
 
 11
 The elements of an attempted monopolization claim under Section 2 of the Sherman Act are as follows: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. Inglis v. ITT Continental Baking Co., 668 F.2d 1014, 1027 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 270 (7th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 669 (9th Cir.1980).
 
 
 12
 To establish monopolization in violation of Section 2 it must be shown that CIL: (1) possessed monopoly power in the relevant market, and (2) used its monopoly power to foreclose competition, gain a competitive advantage, or destroy a competitor. United States v. Griffith, Inc., 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); Paschall v. Kansas City Star Co., 727 F.2d 692, 696 (8th Cir.1984) (en banc); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 275-76 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).
 
 
 13
 Although at trial CIL contested every element of both claims, only the element of anti-competitive conduct or the use of monopoly power is at issue on appeal.[1] To prove a violation of Section 2 under the Sherman Act, whether based on a claim of attempted monopolization or actual monopolization, it must be shown that CIL engaged in anti-competitive behavior. As explained by the court in Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76 (2d Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), a mere showing of monopoly power unaccompanied by evidence of anti-competitive behavior is insufficient to support a claim for monopolization. Therefore, a conclusion that CIL's activities were not anti-competitive would absolve it of liability under both claims. 651 F.2d at 85. These general principles were outlined in the district court's charge to the jury.
 
 
 14
 According to Trace X, CIL engaged in monopolistic conduct with the intent and effect of driving Trace X out of business. Specifically, Trace X contends that CIL's refusal to extend credit or replace the defective TNT constituted anti-competitive, monopolistic conduct. CIL maintains, however, that its denial of credit and its refusal to replace the TNT were acts of ordinary commercial conduct.
 
 
 15
 Acts which would constitute an unlawful use of monopoly power are those "derived from [the monopolist's] power in the market or its size, ... acts which could only have been performed by one with the requisite power." Telex Corp. v. IBM, 510 F.2d 894, 926 (10th Cir.), cert. dismissed, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). See Northeastern Tel. Co., 651 F.2d at 92; Berkey Photo, 603 F.2d at 275. Anti-competitive conduct is conduct without legitimate business purpose. Becker v. Egypt News Co., 713 F.2d 363, 366 (8th Cir.1983); Inglis, 668 F.2d at 1030-31. Such conduct makes sense only because it eliminates competition. Id. Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2. Telex Corp., 510 F.2d at 925-26. The exercise of business judgment cannot be found to be anti-competitive. To be labeled anti-competitive, the conduct involved must be such that its "anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power." Inglis, 668 F.2d at 1030.
 
 
 16
 Since a general verdict was returned against CIL, we must conclude that the jury considered the elements which constitute an antitrust violation, as properly instructed by the district court, and found that CIL had engaged in anti-competitive, monopolistic conduct. After a careful study of the record, however, we conclude that there is insufficient evidence as a matter of law to support such a finding. CIL's refusals to extend credit or replace the TNT were not invalid uses of monopoly power, but were, under the circumstances, ordinary business practices.
 
 
 17
 Our reading of the evidence does not reveal material conflicts in the facts. Insofar as there are differences in the testimony, they simply do not reach the essential antitrust issues presented. CIL presented uncontradicted evidence that Trace X's parent company was in bankruptcy and that Trace X had refused to supply Dun & Bradstreet with financial information. In addition, Trace X's auditors declined to give an opinion on Trace X's 1976 statement of earnings, and Trace X had been unable to secure credit from other sources. CIL's denial of credit to Trace X under these circumstances cannot be considered an unlawful use of monopoly power. See Blair Foods, Inc., 610 F.2d at 671-72. On the basis of the evidence presented, CIL's refusal to extend credit did not amount to unreasonable anti-competitive conduct, but rather constituted a valid exercise of business judgment. See Becker, 713 F.2d at 366; see also Paschall, 727 F.2d at 697; Paschall v. Kansas City Star, 695 F.2d 322, 339-40 (8th Cir.1982) (Henley, J., dissenting). It is certainly not conduct that is "possible or effective only if taken by a firm that dominates its smaller rivals." Berkey Photo, 603 F.2d at 275.
 
 
 18
 In support of its claim of anti-competitive conduct, Trace X argues that CIL threatened to discontinue supplying it with TNT unless Trace X paid for the $160,000 worth of TNT received but not paid for by Trace X.[2] However, terminating or threatening to terminate deliveries to a purchaser who refuses to provide full payment is not predatory or unlawful anti-competitive conduct. Fairdale Farms, Inc. v. Yankee Milk, Inc., 715 F.2d 30, 34 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 711, 79 L.Ed.2d 174 (1984).
 
 
 19
 This case does not involve a refusal to deal. CIL was willing to continue to supply Trace X with TNT; it merely refused to deal with Trace X on other than a cash basis. "Section 2 of the Sherman Act does not give purchasers the exclusive right to dictate the terms on which they will deal," Fairdale Farms, 715 F.2d at 34, nor does it require a monopolist to accede to every demand of its competitors or customers. Glen Eden Hospital v. Blue Cross & Blue Shield, 555 F.Supp. 337, 345 (E.D.Mich.1983).
 
 
 20
 A careful study of the evidence also reveals nothing from which a jury could reasonably conclude that CIL's refusal to replace the defective TNT was anything other than ordinary commercial conduct. As long as he is acting in good faith, a seller does not lose the right to contest a customer's claim simply by having monopoly power. Even though a jury in a breach of warranty action later found that the TNT was defective,[3] there is no evidence in the record to support Trace X's suggestion that CIL deliberately supplied Trace X with defective TNT. The evidence showed that CIL had tested the TNT before shipping it to Trace X and concluded that the TNT was satisfactory. Even Arens admitted that he had no proof that CIL knew that the TNT was defective when shipped to Trace X. Other than the statement made by Ingham, there is also no evidence indicating that CIL's refusal to replace the TNT was in bad faith. Although the report of Trace X's expert stated that the TNT was defective, CIL's experts disagreed. After analyzing some of the defective Trace X primers, CIL believed that the failures resulted from Trace X's manufacturing process rather than from the TNT used. It was not an abuse of its monopoly power for CIL to rely on the tests run by its own research department and, therefore, refuse to replace the TNT.
 
 
 21
 In its brief Trace X also lists CIL's alleged monopolistic pricing and the TNT shortages as further examples of anti-competitive, monopolistic conduct. A careful review of the record reveals that the evidence concerning pricing relates to price discrimination. The district court directed a verdict on Trace X's claim of price discrimination under the Robinson-Patman Act, 15 U.S.C. Sec. 13(a) (1982),[4] and Trace X has not appealed from that ruling. Where its purpose or likely effect is to inhibit competition, discriminatory pricing may also constitute a violation of Section 2 of the Sherman Act. L. Sullivan, Antitrust 122 (1977). However, just as the district court found that there was insufficient evidence of a violation of the Robinson-Patman Act,[5] we conclude that there is insufficient evidence as a matter of law to sustain the jury's finding of a violation under the Sherman Act.
 
 
 22
 In addition to its allegations of price discrimination, Trace X contends that CIL's prices in the United States for TNT were too high, thus reflecting monopolistic pricing. However, setting a high price is not in itself anti-competitive. Berkey Photo, 603 F.2d at 294. See 3 P. Areeda & D. Turner, Antitrust Law 41-42, 148 (1978). Section 2 does not forbid a monopolist to set profit-maximizing prices. L. Sullivan, supra, at 116. Such conduct is not the exclusionary conduct that violates the antitrust laws, but rather is "the normal, rational response of a business ... seeking to maximize profits, sales or revenues." Id. at 100.
 
 
 23
 Trace X's claim that the TNT shortages were induced by CIL as a means of market control also must fail. There is insufficient evidence in the record from which a jury could reasonably conclude that the shortages were other than real. The documents relating to TNT shortages simply show that there were times when CIL was unable to supply all of its customers' demands.
 
 IV.
 
 24
 To further support its claims, Trace X relied on CIL's anti-competitive intent. Trace X's evidence of CIL's intent is its evidence regarding statements made by representatives of CIL. According to Arens and Szaloczi of Trace X, in March, 1977, when they asked CIL to replace the defective TNT, Ingham of CIL responded, "Why would we do that? If we exchange the TNT, you will just use your profits to compete against us in the manufacture of TNT." Szaloczi also testified that Heddle, CIL's export sales manager, had told him that "Trace X would have a lot better time at the meeting tomorrow if CIL had some understanding that Trace X was going to be raising its prices and not going into the manufacture of TNT." Even if it is assumed that proof of these statements supports an inference of anti-competitive intent on the part of CIL,[6] this is not enough to transform CIL's otherwise legitimate business activities into anti-competitive, monopolistic conduct. See Telex Corp., 510 F.2d at 925-28. Evidence of anti-competitive intent alone is not enough; anti-competitive conduct or use of monopoly power must also be shown to prove a violation of Section 2 of the Sherman Act. See Cal. Computer Products v. IBM, 613 F.2d 727, 745 n. 32 (9th Cir.1979) (regardless of intent, Section 2 condemns only the monopolist's use of monopoly power); Telex Corp., 510 F.2d at 925-26; Inglis, 668 F.2d at 1028 (direct evidence of intent alone, without corroborating evidence of conduct cannot sustain a claim of attempted monopolization); Buffalo Courier-Exp. v. Buffalo Evening News, 601 F.2d 48, 54 (2d Cir.1979); Hayes v. Solomon, 597 F.2d 958, 977 (5th Cir.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980) (a manifestation of intent to triumph in the competitive market, in the absence of unfair, anti-competitive or predatory conduct is not enough to establish an antitrust violation).
 
 
 25
 Although we are reluctant to overturn a jury finding, we conclude that there was insufficient evidence as a matter of law to support the jury's verdict.[7] Therefore, we reverse the judgment of the district court.
 
 
 
 [1]
 For purposes of this appeal, CIL does not contest the fact that it has a monopoly in the TNT market. CIL also does not contest the element of anti-competitive intent, but rather argues that even if CIL were found to have had an anti-competitive intent, that would not, in the absence of anti-competitive, monopolistic conduct, amount to a violation of Section 2 of the Sherman Act
 
 
 [2]
 In his testimony Arens admitted that Trace X did owe CIL the $160,000 for the TNT it had received
 
 
 [3]
 Trace X Chemical, Inc. v. Gulf Oil Chemical Co., No. 78-5010 (W.D.Ark.1982), aff'd, 724 F.2d 68 (8th Cir.1983)
 
 
 [4]
 15 U.S.C. Sec. 13(a) provides as follows:
 It shall be unlawful for any person engaged in commerce, ... to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly ..., or to injure, destroy, or prevent competition....
 
 
 [5]
 Although the prohibitions of the Robinson-Patman Act are narrower than those contained in section 2 of the Sherman Act, the insufficiency of evidence precludes a finding of violation under both Acts
 
 
 [6]
 In Agrashell, Inc. v. Hammons Products Co., 479 F.2d 269, 285 (8th Cir.), cert. denied, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973), this Court indicated a hesitancy to infer anti-competitive intent solely from the hearsay testimony of an interested witness
 
 
 [7]
 Due to our resolution of the case on the ground of insufficiency of evidence as a matter of law, we do not reach the other issues on which CIL appealed