GENERAL INDUSTRIES CORPORATION, a Minnesota corporation, and R. Denny Neiberger & Associates, Inc., a Minnesota corporation, Appellees,

v.

The HARTZ MOUNTAIN CORPORATION, a New Jersey corporation, George Spencer, David Lovitz, Walter Albuquerque, and John Doe numbered 1 through 20, Appellants.

GENERAL INDUSTRIES CORPORATION, a Minnesota corporation, R. Denny Neiberger & Associates, Inc., a Minnesota Corporation, Appellant,

v.

The HARTZ MOUNTAIN CORPORATION, a New Jersey corporation, George Spencer, David Lovitz, Walter Albuquerque, and John Doe numbered 1 through 20, Appellees.

Nos. 85–5104, 85–5105 and 85–5111.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1985.

Decided Feb. 4, 1987.

Aubrey M. Daniel, III, Washington, D.C., for appellants.

Clay R. Moore, Minneapolis, Minn., for appellees.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and McMANUS,* Senior District Judge.

LAY, Chief Judge.

This is an appeal from a judgment for treble damages in favor of General Industries (GI), a terminated dealer, against Hartz Mountain Corporation (Hartz), a pet supplies manufacturer. At issue is whether GI produced sufficient evidence to support the jury's verdict that Hartz violated §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. We affirm the district court's judgment on the verdict under § 2 of the Sherman Act.

* The HONORABLE EDWARD J. McMANUS, Senior United States District Judge for the Northern District of Iowa, sitting by designation.

GI, owned principally by R.W. Neiberger, Sr. and his son, D.W. Neiberger, Jr., became a distributor of Hartz pet products for a five-state region[1] in 1970. Due in part to the Neibergers' rapport with retailers and the broad range of pet supplies carried by Hartz, GI became the largest pet supply distributor in the region, distributing to grocery stores, drug stores, and discount chains. RDN, which is also owned by the Neibergers, operated as a broker for Hartz products, which were marketed by Hartz directly to retailers through commissioned brokers instead of through distributors like GI.

When the Neibergers agreed to become Hartz distributors, after being approached to do so by Hartz, they were aware that Hartz's purchase orders contained a standard clause which required payment within thirty days. Testimony at trial indicated that the Neibergers expressed concern to Hartz representatives about becoming a Hartz distributor under these credit terms, since they were aware of the possible cash flow problems that could arise because retailers were often slow in paying distributors for delivered goods. Testimony at trial indicated that a Hartz employee acknowledged these cash flow concerns by stating, "you get the business and we'll worry about the money." The Neibergers maintain that Hartz's printed credit terms were never adhered to in fact, noting that in 1971 Hartz extended to GI a ninety-day credit limit or an $80,000 credit line, and that even these terms were ignored over the next several years. GI presented evidence at trial that Hartz allowed GI's accounts to be over thirty days overdue for seventy-five consecutive months, and that in all but four of those months GI's account was over ninety days overdue. GI also submitted evidence that Hartz distributors across the country were accorded similar extended credit terms contrary to the terms printed on Hartz's forms. Hartz

maintains that even if it had agreed to operate on extended credit terms early into its relationship with GI, by 1973 the parties had agreed to again proceed on thirty-day terms. However, GI presented evidence that in 1973, when Joseph Bardwil of Hartz sent Neiberger, Sr. a letter that required him to sign a security agreement, to give a personal guarantee, and further required that GI operate on thirty-day terms, another Hartz employee told Neiberger, Sr. to ignore the letter and throw it away because "Bardwil doesn't know what he's doing."

The parties agree that Hartz never made it a condition of GI's distributorship that GI deal exclusively in Hartz products. Accordingly, from 1970 through 1978, the Neibergers distributed the products of other pet supply manufacturers in addition to Hartz products. In 1975, Target Stores, GI's largest account, accepted the more attractive offer of Warren, another pet supply manufacturer, and replaced some Hartz items in its stores with Warren products. These products, which included rawhide chew items, chain goods, and toys, were similar to but substantially less expensive than the comparable Hartz items. Before replacing these Hartz products with Warren goods, Target approached Hartz through GI about responding to Warren's offer. Despite encouragement from the Neibergers to meet Warren's offer, Hartz refused to lower its prices to compete with Warren for Target's business. When Warren later developed supply problems and could not meet Target's demands, Target turned to GI in order to obtain a source of comparable products at comparable prices to replace the Warren items in its stores. Target had already asked GI to act as its supplier for all of its pet supply needs, including non-Hartz products. At Target's request, GI imported the requested goods from the Orient. Because GI had to import these goods, which it called "4–Pets,"[2] in

---

1. This area included Minnesota, western Wisconsin, northern Iowa, and eastern North and South Dakota.

2. The record and the parties' briefs differ as to the spelling of this brand name, variously using

"4–Pet", "4–Pets", and "Four Pets." For purposes of this opinion, we will use "4–Pets."

large lots there was a substantial inventory of 4–Pets goods left in GI's warehouse after Target's needs were met. Although GI did not advertise the 4–Pets goods or otherwise spend money to market them, it did seek other outlets for this overstock, including other retailers and other Hartz distributors, by making it known that the 4–Pets products were available and by showing the goods to other distributors at at least one distributor meeting.

Hartz does not claim that GI was not a satisfactory distributor, nor that it had performed poorly on Hartz's behalf. Rather, Hartz's displeasure with GI stems from its claim that GI was in effect financing the 4–Pets venture with Hartz's money.[3] At a meeting in July, 1977, between David Lovitz, Hartz's president, and Neiberger, Sr., Lovitz insisted that GI's accounts immediately be brought current to thirty-day status. When Neiberger, Sr. said that he needed time to do so, Lovitz agreed that GI could have six months. Hartz maintains that Neiberger, Sr. agreed to Lovitz's conditions; Neiberger, Sr. testified that he was "frightened" by this conversation and interpreted Lovitz's words as an ultimatum, which left him with no choice but to agree, even though GI had never operated on such terms before with Hartz. Over the next nine months, GI paid Hartz approximately $1.2 million, but did not completely clear its account of all overdue debt. At meetings in August and September, 1977, Hartz employees told the Neibergers that "the foreign stuff has got to stop" or else they would be "surprised at the things that can happen" alluding to the fact that orders might be short-shipped or mixed-up. GI offered evidence that beginning in 1977, incomplete shipments did become increas-

ingly common, causing friction between GI and its customers.[4]

At a meeting on December 29, 1977, called by Hartz, Lovitz offered to buy GI. When Neiberger, Sr. refused to sell on grounds that the price was unacceptable, Lovitz became abusive, stated that Neiberger was "making a mistake," and said that Hartz "can put fifty trucks on the streets, and we can have you out of business in thirty days." On April 13, 1978, at a meeting between Lovitz and Neiberger, Sr., Lovitz again stated that if Neiberger did not sell out to Hartz, GI would be forced out of business. When asked by GI in early 1978 to make shipments of goods which had been ordered but had never arrived on a C.O.D. or sight draft basis, Lovitz responded that when GI sent in the money it owed, Hartz would "think about it." On April 10, 1978, GI informed Hartz that it considered that the ninety-day terms, on which the parties had conducted business in the past, remained in effect. On April 24, 1978, Lovitz informed Neiberger, Sr. that Hartz no longer wished to purchase GI and that GI was terminated immediately as a Hartz distributor. On that same day, RDN, the brokerage firm owned by the Neibergers, was also terminated by Hartz.

Immediately upon terminating GI, Hartz began a "blitz" of the market, bringing in Hartz personnel from other areas who were assigned to contact and draw away from GI all of GI's retail customers. Several weeks later, GI began operating as a distributor for Sargent's, a pet supplies manufacturer that was Hartz's closest competitor. Geisler, a third pet supplies manufacturer, also secured a share of the market. The result of this activity was that GI retained about half of its original customers, but that many of GI's largest

---

**3.** Hartz contends that its actions were justified because GI was not treating it on an equal footing with other distributors in that GI was paying all other distributors but Hartz within thirty days. GI, however, notes in its brief that Hartz could not have been motivated by this information in 1977 and 1978 because it did not know the details of GI's payment record with other suppliers until three years after the fact, during discovery for this litigation.

**4.** Hartz did counter this evidence with testimony that an accountant had determined that a portion of the "lost" orders were in fact cancelled by GI employees. However, other testimony, including that of Target executives, supported GI's contention that during this time GI was unable to obtain adequate supplies of many Hartz products.

accounts, including Target, were diverted to Hartz. All of the major manufacturers and distributors in the market were forced to cut their prices to retail customers due to the competitive activity. However, GI never recovered from its financial difficulties which started with Hartz's withdrawal of the extended credit terms on which Hartz and GI had historically operated. When GI's sales volume declined from $2.5 million in 1977 to $715,000 in 1981, GI sold its assets, which are now operated as Sargent's Merchandising Co.

GI filed suit against Hartz alleging violations of §§ 1 and 2 of the Sherman Act.[5] RDN sued Hartz under the Sherman Act for lost future brokerage commissions on the sale of Hartz products due to its termination. After a ten-week bifurcated trial, at which Hartz moved for a directed verdict at the close of the plaintiffs' case on liability and renewed the motion at the close of all the evidence, the jury returned a verdict in favor of GI and RDN on all counts and assessed damages. The district court[6] granted Hartz's motion for judgment n.o.v. as to the jury's verdict for RDN on grounds that RDN lacked standing to sue for an antitrust injury. However, it denied Hartz's motion for judgment n.o.v. as to the verdict in favor of GI and entered judgment for GI in the amount of $1,051,133.10 in treble damages and $334,974.34 in costs and attorney's fees. Hartz appeals from the district court's denial of its motion for judgment n.o.v. as to GI and alternatively from the denial of its motion for a new trial. RDN appeals the district court's grant of Hartz's motion for judgment n.o.v.

## I. GI's Antitrust Claims

### Sherman § 1 claim

Hartz claims that there was insufficient evidence presented at trial to support the jury's verdict that Hartz violated § 1 of the Sherman Act. In particular, Hartz claims that there was insufficient evidence from which the jury could reasonably have concluded that Hartz and others entered into a "contract, combination * * *, or conspiracy, in restraint of trade." 15 U.S.C. § 1. To sustain the jury's finding that Hartz violated § 1, there must be evidence in the record that would lead a reasonable mind to conclude that Hartz and others had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). In returning its verdict finding that Hartz had violated § 1, the jury did not indicate with whom it found that Hartz had conspired. Although GI's counsel asserted in his closing argument to the jury that the jury needn't worry about whether a combination occurred here because they "occurred all over the place," on appeal GI identifies three ways in particular in which the jury could have found the existence of concerted action. These are: (1) that Hartz formed a coercively constructed combination with GI to restrict the flow of 4–Pets goods; (2) that Hartz combined with AAA, a Milwaukee-based distributorship, to restrict the flow of 4–Pets merchandise; and (3) that Hartz combined with other distributors to stifle the flow of 4–Pets goods to other parts of the country.

Hartz's attack on the jury's finding of a § 1 violation raises difficult questions. Because this case is more easily resolved on § 2 grounds, we have elected not to address Hartz's challenge to the jury's verdict for GI based on § 1, since the jury found that Hartz violated both §§ 1 and 2

---

**5.** The district court correctly granted GI leave to file its amended complaint, holding that GI's covenant not to sue Hartz, which grew out of an earlier antitrust action against GI and Hartz, does not preclude GI's present suit. The covenant not to sue was executed in April, 1976, after Hartz and GI were sued by another Hartz distributor. Although an earlier version of this suit was dismissed based on the covenant not to sue, that dismissal related only to GI's promise

not to sue for acts occurring before June 15, 1977. The present suit arises out of GI's amendment of its complaint and focuses on events occurring after June, 1977.

**6.** The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota, presiding.

of the Sherman Act. The interrogatories contained in the special verdict form submitted to the jury in the damages portion of the trial do not break down the award of damages separately for violations of § 1 and of § 2. Rather, the special verdict form requested the jury to assign damages, if any, incurred by the "defendants' antitrust violations." Hartz has not challenged on appeal the form of the special verdict, nor do the record or briefs indicate that Hartz objected to the form's wording at trial. Thus, it is sufficient for purposes of upholding the jury's damage award that, for the reasons stated below, we affirm the jury's verdict that Hartz violated § 2 of the Sherman Act.

### Sherman § 2 claim

Section 2 of the Sherman Act is directed toward "[e]very person who shall monopolize, or attempt to monopolize, * * * any part of the trade or commerce among the several States." 15 U.S.C. § 2. The jury returned a verdict for GI on both its claims of actual monopoly and attempted monopoly against Hartz. Hartz claims on appeal that insufficient evidence was presented at trial from which the jury could reasonably conclude that Hartz's actions violated § 2.

Because the jury verdict was in GI's favor, on appeal the evidence must be viewed in the light most favorable to GI. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985); *Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 265 (8th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). We are not free to reweigh the evidence or to reach a different result as long as there is sufficient evidence in the record from which the jury could reasonably conclude that Hartz violated § 2. When the liability portion of this case was submitted to the jury, the verdict form did not include special interrogatories on each element of each claim. "In the absence of special interrogatories we presume the existence of factual findings and legal conclusions necessary to support the verdict reached by the jury." *Central Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 720 (8th Cir.1986) (quoting *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 607 (Fed. Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984)). If there is any evidence to support the jury's finding that the elements of the § 2 claim were proven, the jury's verdict must be upheld. Unless the record taken as a whole lacks any evidence to support the jury's verdict, we must affirm the district court's denial of Hartz's motions for judgment n.o.v.

In order to uphold the jury's determination that Hartz violated § 2, there must be sufficient evidence in the record from which the jury could reasonably find that Hartz committed the offense either of monopolization or attempted monopolization. On appeal, however, the parties' arguments have led us to concentrate on GI's contention that Hartz violated § 2 through an attempt to monopolize. The elements of a claim of attempted monopolization under § 2 are: (1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Trace X*, 738 F.2d at 265. In addition, the plaintiff must prove antitrust injury "reflect[ing] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

The specific intent element requires proof that the defendant intended his acts to produce monopoly power. Specific intent does not merely mean intent to prevail over one's rivals; it goes beyond that to include an intent to control prices or to restrain competition unreasonably. *United States v. Empire Gas Corp.*, 537 F.2d 296, 302 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *see Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). Hartz apparently maintains that its

specific intent to control prices or destroy GI as a source of competition is not at issue on appeal. *See* Reply Brief of Appellants and Brief of Cross-Appellees at 2 ("This appeal does not challenge the sufficiency of the evidence on the issue of intent, and focuses instead on the other legal elements of appellee's claims and on the conduct of the trial"). However, even if Hartz had made no such statement, our review of the record convinces us that there is overwhelming evidence from which the jury could reasonably infer that Hartz intended to do the particular acts in question and that it intended through those acts to acquire monopoly power.

■ In the context of an attempted monopoly claim, specific intent refers not to the defendant's general intent to do a particular act, but to an overall anticompetitive intent expressed through its actions to destroy competition or build monopoly. *Times-Picayune Pub. Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). Specific intent need not be proven by direct evidence, but can be inferred from the defendant's anticompetitive practices or other proof of unlawful conduct. *See Conoco Inc. v. Inman Oil Co., Inc.,* 774 F.2d 895, 905 (8th Cir. 1985). "An anticompetitive practice may have economic justification, but its use may be undertaken with unlawful intent and in the desire to achieve an unlawful goal." *United States v. Dairymen, Inc.,* 660 F.2d 192, 195 (6th Cir.1981). The jury could reasonably have concluded from the facts before it that Hartz's course of conduct was an attempt to achieve a monopoly by depriving the public of the advantages that flow from free competition.

■ The record shows that Hartz tried to persuade Target to drop all non-Hartz competitive pet supplies and to cease doing business with GI. At trial, a Hartz employee, who was Hartz's district manager for Minnesota, and North and South Dakota during the period in question, testified that he believed that although Hartz recognized that GI had been a good distributor, Hartz wanted to take the Target account away from GI because GI was putting competitive merchandise into the Target stores. Testimony at trial indicated that Hartz kept tabs on the presence of 4–Pets products in GI's warehouse and on retail shelves. Evidence at trial also indicated that AAA, a Milwaukee-based Hartz distributor, bought some 4–Pets products from GI in the spring of 1977, but canceled the balance of its unfilled order after Hartz representatives saw the 4–Pets products in AAA's warehouse and were, in the words of an AAA employee, "madder than hell, * * * the maddest I've ever seen them." Hartz personnel told the Neibergers that "Harrison" [New Jersey, site of Hartz's executive headquarters] would not like the fact that GI was carrying 4–Pets products. Another Hartz employee told the Neibergers, "I don't think you are going to be making any more shipments to [AAA]." Evidence indicated that AAA canceled its 4–Pets order because it believed that it could not afford to alienate Hartz by carrying 4–Pets products. GI soon abandoned attempts to sell 4–Pets goods to other sources besides Target. The jury could reasonably have concluded that Hartz exhibited anticompetitive conduct not motivated by legitimate business concerns about GI's financial soundness but designed primarily to restrict the consumer's access to competing products.

■ There is little doubt that an individual manufacturer has the freedom to exercise its own independent discretion as to the parties with whom it will deal, but that right is not unrestricted. Although a refusal to deal, without more, does not violate the antitrust laws, the Supreme Court has found that "[i]f accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, even individual sellers' refusals to deal have transgressed the Act." *Times-Picayune,* 345 U.S. at 625, 73 S.Ct. at 889 (citations omitted). In *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), the Court emphasized that refusals to deal are acceptable only "[i]n the absence of any purpose to create or maintain a monopoly." *Colgate,* 250 U.S.

at 307, 39 S.Ct. at 468. *See Lorain Journal Co. v. United States,* 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951) (the right claimed by the defendant to deal with whomever it pleases, if exercised as a purposeful means of attempting to monopolize interstate commerce, is prohibited by the Sherman Act). These cases plainly teach that a business, especially one with a large degree of market power, may violate § 2 of the Sherman Act if it exercises its power to deal with others, including its own distributor, in a manner which is designed to unreasonably restrain trade. *See, e.g. Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1300 (9th Cir.1978) (a "refusal to deal which is anticompetitive in purpose or effect, or both, constitutes an unreasonable restraint of trade in violation of the Sherman Act"); *United States v. Klearflax Linen Looms, Inc.,* 63 F.Supp. 32, 38–39 (D.Minn.1945) (Nordbye, J.) (in enjoining manufacturer of linen rugs from refusing to deal with one of its own distributors where both had bid on government contract, court stated that while a refusal to deal may be lawful per se, it cannot be used with the design and purpose of wrongfully attempting to monopolize).

Although Hartz, like any manufacturer, has wide latitude to dictate the terms under which it will do business, the jury could reasonably have found that Hartz's acts towards GI were not legitimate business practices directed to accomplishing a lawful end but were specifically designed to destroy a perceived source of competition. That the source of this perceived competition was also a distributor of Hartz goods does not insulate Hartz's acts from the reach of the antitrust laws. There was sufficient evidence in the record from which the jury could have reasonably concluded that Hartz held the requisite specific intent to control prices or restrain competition.

Hartz further argues that there was insufficient evidence presented at trial from which the jury could conclude that Hartz committed overt acts that could be reasonably construed as predatory, exclusionary, or anticompetitive. This court has previously found that "[t]o be labeled anticompetitive, the conduct involved must be such that its 'anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.'" *Trace X,* 738 F.2d at 266 (quoting *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1030 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)).[7] In this vein, the Supreme Court has recently stated that "it is relevant to consider [the impact of the defendant's conduct] on consumers and whether it has impaired competition in an unnecessarily restrictive way," and that "[i]f a firm has been 'attempting to exclude rivals on some basis other than efficiency' it is fair to characterize its behavior as predatory." *Aspen Skiing,* 105 S.Ct. at 2859 (citation omitted). Our review of the record shows that the jury could reasonably have concluded from the evidence that Hartz's actions did not grow out of its reliance on competitive conduct that the Sherman Act encourages, such as superior skill, products, or efficiency. There was substantial evidence from which the jury could find that the credit and supply restrictions Hartz arbitrarily imposed on GI, absent any showing or allegations of GI's financial instability or poor market performance, were not reasonably gauged to promote competition on the merits. Moreover, testimony at trial indicated that GI's 4–Pets products were equal to or superior in quality to the comparable Hartz products and were sold at lower prices.

7. "An attempt charge properly lies against conduct (1) which is totally unrelated to competition on the merits—that is, lacking any plausible claim to redeeming virtue; (2) which clearly implies the presence or prospect of some degree of durable market power—as, for example, conduct not likely to be rationally undertaken by a firm without such power or the hope of attaining it through the challenged conduct; and (3) which has potentially significant exclusionary effects in the generality of cases—in that there is a clear and direct causal connection between the conduct and the power." P. Areeda & D. Turner, *Antitrust Law* ¶ 820 at 313 (1978).

The jury could reasonably find that Hartz's activities did not tend to allow products to compete against each other on their own terms, but rather that Hartz invoked its considerable market power to cause superior competing products to fail to reach retail shelves, preempting any opportunity for the consumer to make a real choice.

Hartz argues that its actions were not predatory but the result of legitimate business practices, and argues in particular that Hartz had no duty to finance GI's sales of 4–Pets products through its credit terms. Although it is perfectly legitimate to refuse to extend credit to a noncreditworthy customer, *see Trace X*, 738 F.2d at 266, there is sufficient evidence in the record to establish that Hartz never questioned GI's financial soundness or creditworthiness. Courts have recognized that credit is an important item in the survival of many businesses, especially distributorships, for without credit distributors "are often unable to pay for orders due to the cash flow problems that result from the delay in securing payment from their own customers." *Robbins Flooring, Inc. v. Federal Floors, Inc.*, 445 F.Supp. 4, 9 (E.D. Pa.1977) (although recognizing that particular circumstances may lead a seller to extend different credit terms to different purchasers, the court observed that "the extension of credit can be a powerful weapon, and the potential exists for its use as an indirect discriminatory practice."). Here, no evidence exists that GI was financially unstable, nor that there were financial pressures on Hartz which compelled it to unilaterally tighten its credit terms. Moreover, although the application of different credit terms to different purchasers does not in itself constitute a violation of the Sherman Act, *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637, 646 (D.N.J.1980), here there was substantial evidence from which the jury could conclude that Hartz's change in the credit terms under which it and GI had successfully operated for several years was motivated by Hartz's knowledge that its action would probably or actually restrict competition from 4–Pets products. *Cf. Euramca Eco-*

*systems, Inc. v. Roediger Pittsburgh, Inc.*, 581 F.Supp. 415, 420 (1984) ("There is no suggestion * * * that different credit terms led to any actual or probable harm to competition, an essential element of a Sherman Act claim"). The jury could reasonably infer that Hartz's unilateral reversal of the historic credit terms between it and GI, leading to Hartz's termination of GI on the grounds that GI had not cleared its debt, was motivated by an intent to prevent competitive merchandise from reaching the consumer.

■ Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition. *Trace X*, 738 F.2d at 266. The jury could have reasonably concluded that Hartz set out to weaken GI through the predatory use of its financial power over GI so as to prevent GI from being a source of competitive pet products and to prevent GI from surviving as a financially stable distributor. The jury was entitled to conclude that Hartz's abrupt withdrawal of credit terms which had been established through the parties' dealings over the course of several years had no legitimate business purpose but made sense only if it was for the express purpose of stifling competition.

■ Hartz also contends that GI's attempted monopoly claim must fail because GI produced insufficient evidence that Hartz possessed significant power in the relevant market. In proving whether the defendant possesses sufficient power to come dangerously close to achieving monopoly power, the plaintiffs must have demonstrated the relevant geographic and product markets within which that dangerous probability occurred. *Empire Gas*, 537 F.2d at 302. It is necessary to appraise Hartz's acts in terms of the relevant market for the product involved, for without a definition of that market there is no way to measure Hartz's ability to lessen or destroy competition. *See Agrashell, Inc. v. Hammons Prods. Co.*, 479 F.2d 269, 286 (8th Cir.), *cert. denied*, 414 U.S. 1022, 94

S.Ct. 445, 38 L.Ed.2d 313 (1973). Here, the parties agree that the relevant geographic market is the five-state region in which GI operated. Therefore, we turn our attention to whether there is sufficient evidence in the record by which the jury could reasonably determine the relevant product market.

It is initially important to keep in mind that "[m]arket definition is not a jurisdictional prerequisite, or an issue having its own significance under the statute; it is merely an aid for determining whether power exists." L. Sullivan, *Antitrust* 41 (1977). Determination of relevant product market is a fact question for which the burden of proof rests on the plaintiff. *Acme Precision Prods., Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1241 (8th Cir. 1973). Because determining the relevant product market is a factual issue which is reserved to the jury, we are not permitted to weigh the evidence or reach a different result we may think more reasonable as long as there is evidence to support the jury's verdict. Arguing that GI produced insufficient evidence of the relevant product market, Hartz contends that "pet supplies"—the relevant market for which GI introduced evidence of market share—is not an accurate description of the market because the degree of competition and market share varied for each of the more than 1200 goods produced by Hartz. Rather, Hartz proposes that the relevant product market should be defined and proved in terms of each individual product which GI marketed under the 4–Pets label as contrasted to the comparable Hartz product.

Defining a relevant product market is primarily "a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134

(1978). Both Hartz and GI carried a group of pet products, in which each individual item may differ significantly from the others within that group, but which are all related because they are used by the same customers—pet owners—and are capable of distribution through the same channels. Although Hartz carried a much more extensive array of products than did GI, the products GI marketed under the 4–Pets brand were all products that directly competed with pet products carried by Hartz. Pet supplies sold to grocery store, drug store, and discount chain store customers thus could reasonably have been found by the jury to be the most pragmatic and realistic description of the level at which Hartz products and other brand products sold by GI were in competition. *See White and White, Inc. v. American Hospital Supply Corp.*, 540 F.Supp. 951, 983 (W.D. Mich.1982), *rev'd on other grounds*, 723 F.2d 495 (6th Cir.1983) ("That a product category * * * is composed of hundreds of non-interchangeable commodities does not prevent the category from being a single antitrust market. A collection of similar but non-interchangeable goods may constitute a single antitrust market if the goods are linked through a single use."). That description comports as well with the way Hartz itself conceptualized the market in which it competed, for testimony at trial indicated that Hartz repeatedly referred to the "pet business" or "pet supply business" in describing itself.[8]

In defining the relevant part of commerce for any product, the reality of the marketplace must serve as the lodestar. *Empire Gas*, 537 F.2d at 303. The jury could reasonably have concluded that it would not realistically reflect actual market practices to apply Hartz's proposed market definition, which would require GI to produce evidence of the market shares Hartz had for every individual product that had a 4–Pets counterpart. The jury could reasonably conclude that such an approach to definition of the relevant product market

---

**8.** We also find it relevant, although not conclusive, that the FTC in its consent decree with Hartz, which was admitted at trial for limited purposes, used the phrase "pet supplies" to describe the market in which Hartz competed.

would improperly and unrealistically fragment the market in a way not practiced even by those competing in the market, including Hartz itself. *Cf. United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966) ("[D]efendants have not made out a case for fragmentizing the types of services into lesser units"). Although there was some evidence to the contrary, the relevant market in which GI competed, and therefore in which any restrictive practices by Hartz must be evaluated, could reasonably have been found by the jury to be pet supplies.

■ Hartz next argues that GI presented only casual estimates of its share of the relevant product market, which it claims falls short of the precision of proof required under *Empire Gas. See* 537 F.2d at 306–07. GI called no economist or expert to testify as to how Hartz's acts affected competition in the relevant market. Although the proof of market share introduced at trial by GI did not consist primarily of documented statistical evidence, but included observations made by persons familiar with the market, the overwhelming impression from the evidence as a whole is that Hartz controlled the dominant share of the pet supply market both locally and nationwide. GI introduced testimony from Neiberger, Jr., who was familiar with the details of the pet supply business in the relevant geographic area. He estimated the relative market share held by Hartz was from eighty to ninety-nine percent in almost every category of retail outlet with which GI did business. A former pet supply buyer for Target, who had dealt with GI during the period in question, said that he was told by a Hartz executive that Hartz controlled seventy-five percent of the pet business in the country. Another witness, who was a Hartz regional district sales manager for the region which included GI's area of operations for part of the time in question, testified that he was told by a Hartz executive that Sargent's, Hartz's closest competitor, had a total volume of pet supply sales barely equal to the volume of sales from Hartz's flea and tick collars alone (which represented five items out of the more than 1200 carried by Hartz).

Testimony at trial also indicated that a Hartz executive told the Neibergers that Hartz was by many times the largest pet supplies manufacturer in the country, stating as an example that there were approximately 38,000 supermarket classifications in the United States and that Hartz had 32,000 of them. GI also introduced statistics and statements taken from promotional literature used by Hartz to motivate its salespeople, which represented Hartz as the dominant pet supplies manufacturer in the country. Although Hartz now discounts the veracity of these statements and figures as mere "puffing," the jury could reasonably have inferred from the contexts in which the information was disseminated that Hartz considered these statements to accurately indicate that Hartz held a significantly large share of the pet supplies market. Moreover, not only was much of the evidence of Hartz's market share drawn from Hartz sources, but Hartz made no attempt at trial to rebut GI's market share proof with evidence to counter the inferences which the jury could reasonably draw from GI's proof. Viewing the record as a whole in the light most favorable to GI, the jury could reasonably have concluded that Hartz had significant power in the relevant product market.

■ Hartz contends that even if GI demonstrated that Hartz had significant power in the relevant market and committed acts which could be construed as predatory, the jury could not reasonably have concluded that there was a dangerous probability that Hartz would succeed. In particular, Hartz argues that because the result of Hartz's actions was that competition in the market increased and that Hartz's share of the market decreased, the jury could not reasonably have concluded from the evidence that Hartz's actions fulfilled the element of dangerous probability required for a § 2 attempt violation.

Attempted monopoly claims are aimed at "the employment of methods, means and

practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *see Lorain Journal*, 342 U.S. at 153, 72 S.Ct. at 186 (finding of attempt does not require proof of success); P. Areeda, *supra*, ¶ 820 at 312–13. "[T]he Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly. It is the attempt which is the offense." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270 (7th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Dangerous probability, therefore, should be evaluated as of when the alleged anticompetitive events occurred. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 992 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). Viewing Hartz's acts from the time they occurred and in the light most favorable to the jury verdict, we believe that there is sufficient evidence in the record to support the jury's implicit finding that there was a dangerous probability that Hartz would succeed in securing sufficient monopoly power to control prices or exclude competition.

This is not a case of modest market power or of ambiguous anticompetitive conduct. Through Hartz's actions in attempting to and in actually preventing customers from dealing with GI, GI was forced out of business. Hartz succeeded in assuring that consumers would have no further access to any 4–Pets products. The jury could reasonably have refused to accept Hartz's use of hindsight plus evidence that GI for a time successfully fought off the effects of Hartz's acts to exonerate it from GI's claims that Hartz violated the antitrust laws. The fact that a plan violative of the spirit of the antitrust laws might ultimately fail does not lead to the conclusion that there was no dangerous probability of success. *Multiflex*, 709 F.2d at 992. That GI was not immediately destroyed, and that Hartz did not successfully take over the entire market does not negate the fact that the jury could reasonably have concluded that Hartz's actions, coupled with its large market presence, created a dangerous probability that Hartz's conduct was capable of success.

Because this is a private antitrust action for money damages, we must also determine whether, under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, GI demonstrated sufficient evidence to prove that it incurred damage proximately caused by reason of that which made Hartz's conduct unlawful. *See Brunswick*, 429 U.S. at 488–89, 97 S.Ct. at 697–98; *Becker v. Egypt News Co., Inc.*, 713 F.2d 363, 370 (8th Cir.1983). Although this legal standard requires proof of injury to the competitive process and not just to the plaintiff, even in *Brunswick* the Supreme Court noted that its decision did not necessarily mean that plaintiffs must prove an actual lessening of competition in order to recover. *Brunswick*, 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14; *see Multiflex*, 709 F.2d at 993–94.

■ Besides testifying as to the nature of Hartz's actions, Neiberger, Jr. also testified as to the injury sustained by GI as a result of those actions. The jury could reasonably have concluded that in effectively preventing 4–Pets products from reaching consumers, Hartz harmed both GI and the competition in the market. Testimony at trial indicated that GI withdrew 4–Pets products from the market and canceled all possible future orders because, due to the huge cash drain from GI caused by Hartz's demands that GI bring its account current, it could not afford to pursue marketing 4–Pets products and ultimately had to withdraw from the pet supply business completely. The jury's answers to the special interrogatories submitted in the damages portion of the trial show that the jury believed that GI had proven that in the absence of Hartz's antitrust violations, GI would have earned additional profits from sales both to pet supply customers it lost in 1978 and from additional sales it could have made to those customers it retained in 1978

had GI been able to continue selling Hartz products. We believe that there was sufficient evidence presented at trial to allow the jury to determine that Hartz's antitrust violations injured not only GI itself but also impaired the competitive process.

Viewing the entire record in the light most favorable to the jury verdict, giving GI the benefit of all legitimate inferences, and assuming to be true all facts and inferences reasonably supported by testimonial and documentary evidence, the jury's determination that Hartz's conduct constituted an attempt to monopolize in violation of § 2 of the Sherman Act was not unreasonable. Hartz's arguments here have some force. However, because the choice between reasonable interpretations of the evidence is properly left for the jury, we believe that the district court correctly determined that the evidence as a whole was of insufficient weight to justify taking the issue from the jury. In sorting through the voluminous evidence, the jury could properly have found that this case is not one in which competition proceeded on the merits of the product, but that Hartz undertook a predatory use of market power. It could reasonably have concluded that Hartz was not motivated by legitimate business concerns, but "was willing to sacrifice short run benefits and consumer good will in exchange for a perceived long-run impact on its smaller rival." *Aspen Skiing*, 105 S.Ct. at 2862. Moreover, in upholding this sanction of Hartz's behavior, there is little danger that desirable competitive behavior that enhances the marketplace for the consumer will be discouraged. We therefore affirm the district court's denial of judgment n.o.v. as to GI's § 2 claim.[9]

**9.** Because we affirm the jury's verdict on GI's § 2 claim on the basis of attempted monopolization, we need not also review the evidence supporting the jury's finding of actual monopolization here. *See, e.g., Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1304 (5th Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).

**10.** The limiting instruction given to the jury more than once during the course of trial read:

Now, ladies and gentlemen of the jury, you are going to hear evidence of a consent decree

## II. Motion for New Trial

Hartz also claims on appeal that the district court erred in denying its motion for a new trial. It argues in particular that the district court erroneously admitted evidence of conversations between David Lovitz of Hartz and R.W. Neiberger, Sr. of GI and contends that the conversations should have been excluded as evidence of settlement negotiations. Hartz also claims that the district court erred in admitting, even for limited purposes, evidence of an FTC consent degree executed in 1979, in which Hartz was prohibited from using coercive tactics with its distributors to stifle the flow of competitive merchandise from these distributors. We reject Hartz's contention that the district court erred in admitting this evidence. Admission of evidentiary matters is within the discretion of the trial court and will not be disturbed on appeal unless abuse of that discretion is shown. We believe that the reasons set out by the district court at trial and as stated in the memoranda accompanying its orders denying Hartz's motions in limine reveal no such abuse of discretion. Moreover, the limiting instruction given by the district court sufficiently informed the jury of the restrictions on its use of the consent decree.[10] The record shows that the instruction's wording was discussed with counsel and that both parties had ample opportunity to suggest changes in the instruction's language. The record does not show that Hartz's counsel objected to the form of the instruction read to the jury. We hold that the trial court did not err in refusing to grant Hartz's motion for a new trial.

entered into by Hartz Mountain and the FTC. The consent decree is not evidence of any wrongdoing on the part of Hartz. You may not infer from the consent decree that Hartz engaged in any wrongful conduct or that it altered its conduct as a result of the consent decree. Although, you may infer that Hartz complied with the decree. You may only use it for determining the state of competition following the effective date of the consent decree.

### III. RDN's Antitrust Claim

RDN, the brokerage firm owned by the Neibergers, asserts on appeal that the district court erred in granting Hartz's motion for judgment n.o.v. as to the jury's verdict in favor of RDN for its antitrust claims against Hartz. Because we believe that the district court correctly found that RDN lacked antitrust standing to sue, we affirm.

We have previously observed that the standing question under the Sherman Act requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them. *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1373 (8th Cir. 1983), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984) (quoting *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983)). Thus, standing to sue under the Sherman Act is limited to a "consumer or competitor" that proximately suffers antitrust injury. *Associated General Contractors,* 459 U.S. at 539, 103 S.Ct. at 909. In an antitrust action, standing goes beyond the constitutional standard of injury in fact and focuses instead on whether the injury was of the type that Congress sought to redress through the antitrust laws and whether a link was demonstrated between the injury and the market restraint. *McDonald,* 722 F.2d at 1373–74. "[M]ere causal connection between an antitrust violation and harm to a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect." *Id.* at 1374.

Unlike GI, RDN did not buy and sell pet products but instead earned commissions by promoting direct sales to retailers of certain products which Hartz marketed only through brokers. RDN also served as a broker for GI itself. Although the Neibergers owned both GI and RDN, it is not claimed nor was there any evidence at trial to show that GI had any financial interest in RDN. Under the facts of this case, even if RDN's injury was a necessary step for the defendant to take in achieving the overall suppression of the market, *cf. McDonald,* 722 F.2d at 1377, RDN was not a consumer of goods or services subject to restraint or an injured competitor of Hartz, the party engaging in the claimed restraint. Since there was no evidence in the record from which a jury could reasonably infer that any market injury or consumer injury flowed from RDN's termination as a broker of Hartz products, the district court correctly granted Hartz's motion for judgment notwithstanding the verdict.

For the reasons set forth above, the judgment of the district court is affirmed.